[No. A140941. First Dist., Div. Four. Aug. 1, 2016.]

PETER L. FUNSTEN, Plaintiff and Appellant, v.
WELLS FARGO BANK, N.A., et al., as Executors, etc., Defendants and
Respondents.

[No. A141853. First Dist., Div. Four. Aug. 1, 2016.]

Estate of ROBERT FOLGER MILLER, Deceased.
GEORGE R. BIANCHI et al., as Executors, etc., Petitioners and Appellants,
v.
PETER L. FUNSTEN, Objector and Appellant.

**COUNSEL**

Aaron, Riechert, Carpol & Riffle, Charles M. Riffle, Melissa R. Karlsten, Matthew R. Owens; Farella Braun + Martel, Kelly A. Woodruff; Crist, Biorn, Shepherd & Roskoph and Kristopher W. Biorn for Plaintiff and Appellant and for Objector and Appellant.

Reed Smith, Paul D. Fogel, Dennis Peter Maio; Anderson Yazdi, Hwang, Minton + Horn, John D. Minton and Steven D. Anderson for Defendants and Respondents and for Petitioners and Appellants.

**OPINION**

**RUVOLO, P. J.—**

## I.

## INTRODUCTION

These consolidated appeals arise out of disputes regarding the administration of the Miller Family Trust I (Trust I), which was created by Robert Folger Miller and Maryon Miller in 1991.[1] Trust I became irrevocable when Maryon passed away in 1994. Robert died many years later in early 2013.

---

[1] The appellate record shows that there is also a Miller Family Trust II (Trust II), although that instrument is not at issue in these appeals. For clarity and consistency, we will use first names to refer to Robert, Maryon and all of their relatives. No disrespect is intended.

In August 2013, Peter L. Funsten, who is Maryon's son, filed a "safe harbor" application under former section 21320 of the Probate Code,[2] requesting a judicial determination that he would not violate a "no contest" clause in the Trust I instrument by filing a petition to establish that he is the sole successor trustee of Trust I, notwithstanding the fact that Robert designated an additional cosuccessor trustee after Maryon passed away. The executors of Robert's probate estate, George R. Bianchi and Wells Fargo Bank, N.A. (Executors), opposed Peter's safe harbor application. In December 2013, the probate court denied Peter's application, concluding his proposed petition would violate the no contest clause. Peter filed a timely appeal from that order.

In January 2014, Executors filed a petition for a determination that Peter violated no contest clauses in Trust I and in Robert's will by filing creditor's claims against Robert's probate estate to recover damages for the allegedly improper removal of trust assets. In May 2014, the trial court entered a judgment which found that Peter's conduct constituted a contest of Robert's will, but it did not constitute a contest under the terms of the no contest clause in Trust I. Both Peter and Executors timely appealed the judgment.

We conclude that Peter was not entitled to a ruling on the merits of his safe harbor application because that statutory procedure has not been available since former section 21320 was repealed in January 2010. Therefore, we affirm the December 2013 order, but only after striking the probate court's finding that Peter's proposed petition constitutes a contest of Trust I.

We further conclude that the probate court correctly found that Peter did not violate the no contest clause in Trust I by filing creditor's claims against Robert's probate estate, but that the court erred by finding that such conduct constituted a contest of Robert's will. Peter is not a beneficiary of Robert's will, and thus he could not have violated the no contest clause in that instrument as a matter of law. Therefore, we reverse the May 2014 judgment and remand this case with directions for the court to enter a new judgment consistent with this decision.

## II.

## OVERVIEW OF LAW

To put the facts of this case in proper perspective, we begin with an overview of California law governing the enforcement of no contest clauses.

---

[2] Subsequent statutory references are to the Probate Code, unless otherwise stated.

"An in terrorem or no contest clause in a will or trust instrument creates a condition upon gifts and dispositions provided therein. [Citation.] In essence, a no contest clause conditions a beneficiary's right to take the share provided to that beneficiary under such an instrument upon the beneficiary's agreement to acquiesce to the terms of the instrument. [Citation.]" (*Burch v. George* (1994) 7 Cal.4th 246, 254 [27 Cal.Rptr.2d 165, 866 P.2d 92].)

California has long followed the common law rule that no contest clauses are generally enforceable, but strictly construed and subject to several public policy exceptions. (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 422 [165 Cal.Rptr.3d 476, 314 P.3d 780] (*Donkin*).) This rule attempts to reconcile competing policies of (1) "honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument," on the one hand, and (2) "avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument" on the other. (*Ibid.*)

In 1989, legislation was enacted to codify partially this common law. (*Donkin, supra,* 58 Cal.4th at p. 423.) The 1989 legislation recognized the general enforceability of no contest clauses, subject to several express limitations. (*Ibid.*) "The 1989 legislation also established the safe harbor declaratory relief procedure as a method of determining whether a particular motion, petition or other act by a beneficiary would be a contest within the terms of the particular no contest clause. [Citations.] When the Probate Code was repealed and reenacted in 1990, the substance of the 1989 no contest clause provisions was continued, although [the original safe harbor statute] became former section 21320, which was limited to instruments that were or had become irrevocable. [Citation.]" (*Id.* at p. 423, fn. 6.)

In the decades that followed, the Legislature periodically amended the 1990 legislation to comport with and clarify the law as it was developing in the courts. (*Donkin, supra,* 58 Cal.4th at pp. 423–425.) For example, in 2000, the Legislature set outer limitations on the enforceability of no contest clauses in former section 21305. Subdivision (a) of former section 21305 listed actions that did not constitute "a contest unless expressly identified in the no contest clause as a violation of the clause." Subdivision (b) listed actions that did not "violate a no contest clause as a matter of public policy" "[n]otwithstanding anything to the contrary" in the underlying instrument. Such actions included, for example: "(6) A petition challenging the exercise of a fiduciary power." (Former § 21305, subd. (b)(6).)

Unfortunately though, as the no contest law evolved, "[t]he complexity of the statutory scheme actually promoted further uncertainty as to the scope of application of a no contest clause, which in turn led to widespread use of the

safe harbor declaratory relief procedure. The frequent use of the safe harbor procedure added an additional layer of litigation to probate matters, which undermined the goal of a no contest clause in reducing litigation by beneficiaries. [Citation.]" (*Donkin, supra*, 58 Cal.4th at p. 424.)

In 2008, the Legislature repealed the 1990 legislation and replaced it "with a new set of statutes governing no contest clauses." (*Donkin, supra*, 58 Cal.4th at p. 426; see §§ 21310–21315.) The new scheme abandons the former approach of using an " 'open-ended definition of [a] "contest," combined with a complex and lengthy set of exceptions,' " and instead limits the enforcement of no contest clauses " 'to an express and exclusive list of contest types.' " (*Donkin, supra*, 58 Cal.4th at pp. 425, 426.) That list is set forth in section 21311, subdivision (a), which states: "A no contest clause shall only be enforced against the following types of contests: [¶] (1) A direct contest that is brought without probable cause. [¶] (2) A pleading to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application. [¶] (3) The filing of a creditor's claim or prosecution of an action based on it. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application." The new law also "discontinued the safe harbor declaratory relief procedure of former section 21320. [Citation.]" (*Donkin, supra*, 58 Cal.4th at p. 427.)

The 2008 legislation went into effect on January 1, 2009, and became operative on January 1, 2010. (*Donkin, supra*, 58 Cal.4th at p. 426; see §§ 21310–21315.) The Legislature limited application of the current law to "any instrument, whenever executed, that became irrevocable on or after January 1, 2001." (§ 21315, subd. (a).)

## III.

## STATEMENT OF FACTS

A. *Trust I*

1. *Trust Assets and Administration During the Lifetime of the Trustors*

On October 4, 1991, Maryon and Robert executed Trust I as a revocable trust, naming Robert as trustee and Peter as successor trustee. Assets of Trust I, all of which were deemed to be community property, consisted of property described in an attached "Schedule A," together with any later added property. Two categories of assets were listed on Schedule A: (1) a parcel of

real property located in the Town of Hillsborough, which the parties refer to herein as Robin Road, and (2) all furniture and furnishings in the trustors' home on Robin Road.

During their joint lifetimes, the trustors had full access to trust income and principal. "Immediately upon the death of either of the Trustors," the trust fund was to be divided into three subtrusts, designated "Trust A," "Trust B" and "Trust C." Trust A was to consist of the survivor's interest in the trust assets, while Trust B and Trust C were to hold some combination of the deceased trustor's interest in the assets. Under article VIII, Trust I was to become irrevocable after the death of either trustor, with one possible exception pertaining to Trust A that we discuss below.

During his or her lifetime, the survivor trustor was entitled to the entire net income of all three subtrusts, as well as "such sums out of the principal as the Trustee deem[ed] reasonably necessary for the Survivor's proper support . . . ."

### 2. *Distribution of Trust A (Survivor Trust)*

The distribution of the Trust A fund after the death of the survivor depended on whether Maryon or Robert died first. Article III, paragraph 4 provided that if Maryon was the survivor trustor, she would retain the right to revoke Trust A and to make any future provision for the distribution of the Trust A fund, but if the survivor was Robert, then "Trust A shall be irrevocable and no person shall have the power to alter amend, modify or revoke the same."

If Robert was the survivor trustor, the trust instrument gave him a limited power of appointment with respect to Trust A assets, which was conferred by the following language in paragraph 6 of article III: "Upon the death of the Survivor, if the Trustor husband is the Survivor, Trust A shall terminate and the Trustee shall distribute and deliver the balance of Trust A then remaining (including both principal and any accrued or undistributed income) to such one or more natural persons from the class composed of the Trustor wife's son, PETER L. FUNSTEN, and the issue of PETER L. FUNSTEN living at the time of the death of the Survivor, and on such terms and conditions, either outright or in trust, as the Survivor appoints by his last valid will (whether admitted to probate or not) specifically referring to and exercising this limited power of appointment, whether such will is executed before or after the death of the first of the Trustors to die; provided, however, that the Trustee shall first pay out of the principal of Trust A any estate or inheritance tax attributable to Trust A by reason of the Survivor's death."

Article III, paragraph 6 further provided that if Robert failed to "effectively exercise" or only partially exercised his limited power of appointment, "any

portion of Trust A not effectively appointed by the Survivor shall be distributed in accordance with the provisions of Subparagraphs 8.1, 8.3 and 8.4 of this Article." As discussed below, those provisions pertain to the distribution of assets from Trust C.

### 3. *Distribution of Trusts B and C (Decedent Trust)*

The disposition of the assets from Trusts B and C, which consisted of the decedent trustor's interest in the Trust I assets, did not depend on which trustor was the first to die. In either case, after the death of the survivor, the two subtrusts were to be combined into Trust C and the resulting fund was to be distributed in accordance with the provisions of article III, paragraph 8. Under those provisions, the deceased trustor's interest in (1) Robin Road was to be distributed to Peter (subpar. 8.1); (2) the furniture and furnishings on the downstairs level of Robin Road was to be distributed to Peter (subpar. 8.1); (3) the furniture and furnishings on the upstairs level of Robin Road was to be distributed to Maryon's daughter, Susan Meade Kennedy (Meade) (subpar. 8.3); and (4) the balance of any funds was to be divided equally between Peter and Meade (subpar. 8.4).[3]

### 4. *The No Contest Clause*

Article X, paragraph 3 of the trust agreement stated, in pertinent part: "In the event that any beneficiary of this trust, singularly or in conjunction with any other person or persons, shall contest or in any manner attempt to defeat the validity of this trust or of the last will of either of the Trustors or shall undertake any legal proceeding that is designed to thwart the Trustors' wishes as expressed herein or to seek to obtain an adjudication in any proceeding in any court that this trust or any of its provisions or that such will or any of its provisions are void or seek otherwise to void, nullify or set aside this trust or any of its provisions or such will or any of its provisions, then the right of that person to take any interest given to him by this trust shall be void and this trust shall be administered as if that person had died without surviving issue before both of the Trustors."

### 5. *The First Amendment*

On January 12, 1994, Maryon passed away. She was survived by Robert, who became the survivor trustor of Trust I and continued to act as its trustee.

On May 22, 1996, Robert executed a "First Amendment to Trust Agreement" (the First Amendment). The First Amendment added paragraphs to the

---

[3] Subparagraph 8.2 of article III provided for a cash payment from the Trust C fund to Maryon's son Reed Funsten, if he was then living. The record contains very little information about Reed, who plays no role in the current appeals.

trust instrument which designate an additional successor trustee of Trust A. While the original provisions of the Trust I agreement designated Peter as the successor trustee, and Peter's wife as an alternate successor trustee, the First Amendment provided that if Robert for any reason ceased to act as the trustee of Trust A, then Peter and his sister Meade would be cotrustees of Trust A.

### B.  *Robert's Will*

On April 21, 2006, Robert executed the "Will of Robert Folger Miller." In that instrument, Robert nominated Executors as the executors of his probate estate, exercised his limited power of appointment, and made other directives. But, Robert did not use his will to make any gift from his probate estate.

#### 1.  *Exercise of Limited Power of Appointment*

In article III of his will, Robert exercised his limited power of appointment under Trust I by directing that, upon his death, the Trust A fund was to be distributed and delivered in trust to the trustees of a new trust. In article III, paragraph 1, Robert designated Peter and Meade as cotrustees "to act together" to administer the new trust in accordance with paragraph 2, which stated: "Upon my death, simultaneously with the distribution of the assets of Trust A under [Trust I] (including both principal and any accrued or undistributed income) to the Trustee[s] named in paragraph 1 of this Article, Trust A shall terminate and the Trustee[s] shall distribute and deliver the trust fund as then constituted to the beneficiaries named and in accordance with the provisions of subparagraphs 8.1 (as modified hereinbelow), 8.3 and 8.4 of Article III of the said Trust Agreement establishing [Trust I] . . . . With respect to the provisions of subparagraph 8.1 of Article III of the said Trust Agreement establishing [Trust I], I intend that the gift of the furniture and furnishings which were located on the downstairs level of my residence at [Robin Road], as of the date of the death of [Maryon], or the sale proceeds therefrom, be completely and fully satisfied by the distribution to [Peter] of the remaining items of such furniture and furnishings located on the downstairs level of my said residence at 101 Robin Road at my date of death together with the pecuniary gift to [Peter] under the provisions of . . . THE ROBERT FOLGER MILLER TRUST . . . ."

The validity and actual effect of Robert's limited appointment are not issues presented by these appeals. Nevertheless, it is useful to clarify here what Robert attempted to accomplish. First, he used his power to identify Meade as an additional trustee of the Trust A fund, notwithstanding that Peter was the only successor trustee named in Trust I. Second, Robert used his appointment power to direct a distribution of the Trust A fund to the beneficiaries named in paragraph 8 of article III of Trust I rather than to one

or more of the members of the class of Trust A beneficiaries set forth in paragraph 4 of article III of Trust I. Third, Robert used his appointment power to amend article III, subparagraph 8.1 of the Trust I instrument, notwithstanding the fact that Trust I had become irrevocable upon Maryon's death.

### 2. *Disposition of Residue*

In his will, Robert did not make a bequest or devise of any asset of his probate estate. Instead he directed that the residue of his estate was to be added to the trust fund of his personal trust, "THE ROBERT FOLGER MILLER TRUST" (hereafter the RFM Trust), and was to be distributed pursuant to the terms of that instrument.

### 3. *No Contest Clause*

The no contest clause, the longest part of Robert's will, began with this paragraph: "In the event that any beneficiary under this will . . . singularly or in conjunction with any other person or persons, contests or in any manner attempts to defeat the validity of [the RFM] Trust, this will or [Trust I] (as modified under the terms of this will or [the RFM] Trust) or undertakes any legal proceeding that is designed to thwart my wishes as expressed herein or in [the RFM] Trust or to seek to obtain an adjudication in any proceeding in any court that this will or any of its provisions or that [the RFM] Trust or any of its provisions are void or seek otherwise to void, nullify or set aside this will or any of its provisions or [the RFM] Trust or any of its provisions, then the right of that person to take any interest given to him by this will shall be void and this will shall be administered as if that person had predeceased me without surviving issue."

The no contest clause set forth a nonexclusive list of 18 possible actions that a will beneficiary might take which were "deemed" to be a violation of the no contest clause, the third of which was described as follows: "3. Filing of any creditor's claim against my probate estate or against the trust fund of my [RFM] Trust (without regard to the validity of such claim), or prosecuting an action based upon such claim; acting in any adverse manner to a fiduciary in any action or proceeding to determine the character, title or ownership of trust property or property of my probate estate."

The no contest clause closed with this additional provision: "Notwithstanding the provisions of California Probate Code Section 21300 et seq., or any successor statute thereto, it is my express intent that the foregoing no contest provision shall be construed in such manner as to give it its broadest and most expansive application. I acknowledge that under California Probate Code

Section 21305(b), as amended from time to time, certain pleadings or actions are considered actions that are not in violation of a no contest clause as a matter of public policy, and to the extent any part of the foregoing no contest clause is considered such a proceeding, it is my intent further that such pleadings or actions be deemed by a court of competent jurisdiction to be a violation of the foregoing no contest clause if the court determines such pleadings or actions to be frivolous or unsuccessful. . . ."

## C. *Robert's Trust*

As noted, Robert directed that the residue of his probate estate was to be distributed to the RFM Trust. In October 2007, Robert executed a final amendment and restatement of the trust agreement for the RFM Trust. According to that restated agreement, all assets of the RFM Trust were Robert's separate property. Robert named himself as trustee and Executors as his successor trustees. Beneficiaries of the RFM Trust included Robert's children, Therese and Paul, as well as Peter, Meade and others.

Robert's trust left Peter a cash gift of $150,000, which was conditioned on Peter accepting that gift along with any furniture from the Robin Road house that was distributed to him from Trust I as "full and complete satisfaction" of the gift of the furniture and furnishings from the downstairs level of Robin Road that was devised to Peter by Robert and Maryon in Trust I. Paragraph 3.3(c) of the RFM Trust agreement stated that if Peter were to make a claim against Trust I, the RFM Trust, or Robert's probate estate with respect to any furniture from Robin Road that was not available for distribution after Robert's death, then Robert's pecuniary gift to Peter "shall lapse and not be effective."

The RFM Trust agreement also contained a no contest clause which provided for the invalidation of any gifts to any beneficiary who contested or attempted to defeat the validity of any provision of the RFM Trust, Robert's will, or Trust I as modified by Robert.

## D. *Peter's Safe Harbor Application*

Robert died on February 14, 2013. In May 2013, Robert's 2006 will was admitted to probate without objection, and Executors were appointed, also without objection.

On August 16, 2013, Peter filed an application in probate court, seeking an order that he would not violate the no contest clause in Trust I by filing a petition for a judicial determination that he is the sole acting trustee of

Trust I. Peter made his application pursuant to former section 21320.[4] He alleged that he was entitled to a safe harbor determination notwithstanding that former section 21320 was repealed in 2010 because Trust I became irrevocable in 1994 and the "current Probate Code only applies to instruments that became irrevocable after January 1, 2001." (Citing § 21315.)

The petition that Peter proposed to file alleged the following material facts: When Maryon died, the assets of Trust I included Robin Road, all of its furniture and furnishings, and cash and securities in accounts at Merrill Lynch and Dean Witter. Robert violated the trust agreement by withdrawing more than $5 million from Trust A, and Peter intended to file an action against Robert's estate to "redress" that breach of trust. Peter is the "duly appointed and acting Successor Trustee of Trust A within the Trust I trust agreement." Robert's attempts to amend the trust and to exercise his special power of appointment to add Meade as a cotrustee had no legal effect, but were efforts by Robert to prevent Peter from pursuing breach of trust claims against Robert's estate. With his prayer for relief, Peter intended to seek judicial declarations that he is the sole successor trustee of Trust A, and that Robert's First Amendment and exercise of his power of appointment were invalid. Peter also intended to request an order that if Meade was validly appointed, she be removed as successor trustee of Trust A.[5]

Executors opposed Peter's application, arguing that the relief requested in the proposed petition violated Trust I's no contest clause, which explicitly prohibited a challenge of Robert's will.

At an October 8, 2013, hearing, the Honorable Steven L. Dylina advised the parties that the court had independently discovered that Peter had filed creditor's claims against Robert's probate estate while his safe harbor application was pending. The court provided a "sua sponte" advisory opinion that filing the creditor's claims likely violated the no contest clause in Trust I. After further discussion, the court decided not to rule formally on that matter

---

[4] Former section 21320 stated: "(a) If an instrument containing a no contest clause is or has become irrevocable, a beneficiary may apply to the court for a determination of whether a particular motion, petition, or other act by the beneficiary, . . . would be a contest within the terms of the no contest clause. [¶] (b) A no contest clause is not enforceable against a beneficiary to the extent an application under subdivision (a) is limited to the procedure and purpose described in subdivision (a). [¶] (c) A determination under this section of whether a proposed motion, petition, or other act by the beneficiary violates a no contest clause may not be made if a determination of the merits of the motion, petition, or other act by the beneficiary is required. [¶] (d) A determination of whether Section 21306 or 21307 would apply in a particular case may not be made under this section."

[5] Peter inadvertently filed his petition at the same time he filed his safe harbor application. The probate court granted Peter relief from that filing mistake. This ruling is not an issue on appeal.

because it was not raised in the safe harbor application or any other pending petition, but the court opined that the creditors' claims raised a significant issue for a future petition. The parties then proffered opposing views on the substantive issue whether filing Peter's proposed petition would violate the Trust I no contest clause. At the conclusion of the hearing, the court found that Peter's proposed petition would constitute a direct attack and a contest of Trust I.

On December 6, 2013, the court file a final order denying Peter's application under former section 21320 for a determination that his proposed petition would not constitute a contest of Trust I. The order incorporated the following finding: "[U]nder the broadly written no contest clause in the Miller Family Trust I dated October 4, 1991, the underlying Petition for Court Determination that Peter L. Funsten is Sole Acting Trustee of the Miller Family Trust I is a direct attack to the trust even under the prior no contest law applicable in 1994." (Italics omitted.)

### E. Peter's Creditor's Claims

As the probate court observed, Peter filed two creditor's claims against Robert's probate estate while his safe harbor application was pending. Those claims sought damages resulting from actions Robert allegedly took after Maryon's death in violation of his fiduciary duties as trustee of Trust I.

Peter's first claim sought damages for the withdrawal of all funds from two investment accounts that allegedly were assets of Trust I. In support of this claim, Peter outlined the following facts: In May 1993, Robert opened an investment account at Dean Witter Reynolds in his capacity as trustee of Trust I, which was funded with stocks valued at more than $337,500. In June 1993, Robert opened another trust account at Merrill Lynch, Pierce, Fenner & Smith Inc., which was funded with cash and stock valued at more than $700,000. At the time of Maryon's death, the Merrill Lynch account contained approximately $2,898,697 in assets, and the Dean Witter account contained approximately $2,612,787.93 in assets. Thereafter, "despite the fact that Trust I became irrevocable after the death of his wife, Robert, having no authority whatsoever to do so, withdrew all of the assets from the Dean Witter Account on or about July 1994 and converted them for his own use." Also, Robert allegedly "withdrew all of the assets from the Merrill Lynch Account in or about October 1994 and converted them for his own use." Thus, Peter alleged, "as a result of his actions, Robert breached his fiduciary duty as trustee of Trust I."

Peter's second creditor's claim sought damages for the loss of furniture and furnishings that were located on the lower level of Robin Road at the time of

Maryon's death. Peter alleged that "Robert did not sell any of the downstairs level furniture and furnishings. Rather, during his lifetime, and without any authority, Robert gave away many of the downstairs level furniture and furnishings such that many valuable items are missing or have not been returned to Trust I." Peter further alleged on information and belief that "Robert converted the furniture and furnishings for his own use and breached his fiduciary duty as trustee of Trust I."

On December 17, 2013, Executors rejected both of Peter's claims "Entirely." Executors did not state any ground or provide any explanation for rejecting these claims.

### F. The Executors' Petition

In January 2014, Executors filed a petition for an order that Peter had violated the no contest clauses in Trust I and in Robert's will by filing the creditor's claims against Robert's probate estate. Executors argued that the provision in Robert's will, which provides that the filing of a creditor's claim constitutes a contest is an enforceable no contest clause under section 21311 of the current law. Furthermore, Executors' reasoned, Peter's decision to contest Robert's will was an express violation of the no contest clause in Trust I.

In his opposition, Peter argued that this case is governed by the former no contest law because section 21315 dictates that current law only applies to instruments that became irrevocable after January 1, 2001, and Trust I became irrevocable in 1994. Furthermore, according to Peter, under the former law any attempt to disinherit a beneficiary for alleging a breach of fiduciary duty by the trustee is void as against public policy.

On February 19, 2014, a hearing on Executors' petition was held before the Honorable George A. Miram. The court took the matter under submission, and, on March 13, 2014, it filed a 13-page order pursuant to which it granted in part and denied in part Executors' petition for a declaration that Peter violated the no contest clauses in Trust I and in Robert's will.

The court applied the current law to determine whether Peter's actions constituted a contest of Robert's will with the effect of voiding any interest that Peter acquired under that will. The court found that under section 21311, subdivision (a)(2), the will's no contest clause created a valid forced election, pursuant to which Peter was required to choose between accepting what was bequeathed to him under the will or pursuing his creditor's claims, and by filing his claims Peter elected the latter course of action and forfeited his interests under the will. In reaching this conclusion, the court also found that,

to the extent the current law continues to recognize a public policy exception for claims against a fiduciary, that exception would not apply to Robert's will because Robert was never a fiduciary of his own probate estate.

The court reached a different conclusion regarding the impact of the creditor's claims on Peter's status as a beneficiary of Trust I. The court found that the "plain wording of the no contest clause in Trust I . . . would appear to include the contest of [Robert's] will as a contest of Trust I for purposes of the no contest clause." However, the court also found that the trust's no contest clause was not enforceable against Peter under the circumstances presented here. Applying the former law (because the trust became irrevocable prior to 2001), the court found that former section 21305 codified a common law policy which protects beneficiaries from disinheritance for challenging the actions of a fiduciary. The court concluded that this policy protected Peter from being disqualified as a beneficiary of Trust I based on the filing of creditor's claims which alleged a breach of fiduciary duty by the trustee of Trust I.

In accordance with the findings summarized above, the March 2014 order ends with this conclusion: "[T]his court finds that while [Peter] has engaged in conduct that constitutes a contest under the terms of the no contest clause in [Robert's] will, Peter . . . has not engaged in conduct that constitutes a contest under the terms of the no contest clause in Trust I." The probate court incorporated its March 2014 order into a final judgment which was filed on May 9, 2014.

## IV.

## DISCUSSION

### A.   *Standard of Review*

These consolidated cases present three rulings for our review: the denial of Peter's safe harbor application; the finding that Peter's creditor's claims violate the no contest clause in Robert's will; and the finding that Peter's creditor's claims do not violate the no contest clause in Trust I.

The parties agree our standard of review is de novo. " 'The standard of review where the applicability of a no contest clause is at issue and there are no disputed facts is de novo. [Citation.]' " (*Bradley v. Gilbert* (2009) 172 Cal.App.4th 1058, 1068 [91 Cal.Rptr.3d 680].) Furthermore, the interpretation of a statute is also a question of law subject to independent review on appeal. (*Ibid.; Jenkins v. Teegarden* (2014) 230 Cal.App.4th 1128, 1138 [179 Cal.Rptr.3d 304].)

B.  *Peter Was Not Entitled to a Safe Harbor Ruling*

In his first appeal, Peter contends that the denial of his safe harbor application must be reversed because the former law applies to the no contest clause in the Trust I instrument, and the probate court committed legal error by concluding that Peter's proposed petition constituted a contest of the trust under the former law. We do not reach the merits of this claim because we conclude that Peter was not entitled to a safe harbor ruling under the circumstances presented here.

As noted above, Peter's August 2013 safe harbor application was filed under former section 21320, a statute that was repealed on January 1, 2010, and was not replaced with a new law authorizing a safe harbor procedure. Thus, the threshold question is whether this former statute was available to Peter in this case. Executors raise this issue in their respondents' brief. In reply, Peter argues that the former safe harbor statute is available to obtain an advisory opinion on any issue arising under the former no contest law. We disagree.

■  Our starting point is section 3, the general statute governing the "applicability of changes to the Probate Code." (*Rice v. Clark* (2002) 28 Cal.4th 89, 99 [120 Cal.Rptr.2d 522, 47 P.3d 300].) Section 3, subdivision (c) states: "Subject to the limitations provided in this section, a new law applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, creation of a fiduciary relationship, death of a person, commencement of a proceeding, making of an order, or taking of an action." "The manifest purpose" of section 3 is "to make legislative improvements in probate law applicable on their operative date whenever possible . . . ." (*Rice v. Clark, supra*, 28 Cal.4th at p. 99.)

As noted in our overview of the law, an important improvement in probate law accomplished by the 2008 legislation was the reduction in litigation by beneficiaries that resulted from the elimination of the safe harbor procedure. (*Donkin, supra*, 58 Cal.4th at pp. 424–426.) Thus, interpreting the current law to eliminate the right to file a safe harbor application after the operative date of the current law would advance the legislative purpose of section 3. However, as the statutory language of section 3 reflects, the general rule in favor of retroactive application of a Probate Code statute is subject to exceptions, and Peter contends two of these exceptions are applicable here.

■  Section 3, subdivision (b) states that "[t]his section governs the application of a new law except to the extent otherwise expressly provided in the new law." Here, the new no contest law includes section 21315, which

expressly provides that "[t]his part applies to any instrument, whenever executed, that became irrevocable on or after January 1, 2001," but that it "does not apply to an instrument that became irrevocable before January 1, 2001." Thus, notwithstanding section 3, subdivision (c), the current no contest law applies only to instruments that became irrevocable after January 2001, and the former law on this subject applies to instruments that became irrevocable before that date.

However, Peter erroneously assumes that section 21315 also establishes that the safe harbor procedure is still available to beneficiaries who seek rulings regarding the enforceability of no contest clauses under the former law. Section 21315 addresses the question of what law applies to an *instrument*. Peter's safe harbor application is not an instrument, but a pleading (i.e., a procedural device) that he filed under a statute that had already been repealed. Because Peter's application is not an instrument, section 21315 is inapposite.

■ Peter also attempts to invoke section 3, subdivision (g), which states: "If the new law does not apply to a matter that occurred before the operative date, the old law continues to govern the matter notwithstanding its amendment or repeal by the new law." By its clear terms, section 3, subdivision (g) applies to "a matter" if (1) the new law does not apply to that matter, *and* (2) that matter "occurred" before the operative date of the new law. A safe harbor application satisfies the first prong of this exception because the new no contest law does not apply to safe harbor applications. However, Peter's safe harbor application did not "occur" before the operative date of the new law; Peter filed his application more than three years after the operative date of the current no contest law. Thus, section 3, subdivision (g) did not authorize the probate court to reach the merits of Peter's safe harbor application in this case.

*Donkin, supra,* 58 Cal.4th 412 is instructive. That case involved a family trust established by a husband and wife in 1988. (*Id.* at p. 415.) Husband died first. Shortly before wife's death in 2005, she executed a trust amendment that changed the allocation of trust assets after her death. Both the trust instrument and its amendment contained no contest clauses. (*Id.* at p. 418.) In 2009, beneficiaries filed an application under former section 21320 for a safe harbor ruling regarding the effect of a proposed petition to compel the immediate distribution of trust assets pursuant to the allocation set forth in the original trust instrument. (*Donkin,* at pp. 419–420.) When the new no contest law became operative in January 2010, the safe harbor application was still pending. (*Ibid.*) The probate court and Court of Appeal addressed the merits of the application, accepting the parties' theory that a safe harbor ruling was available because the former law applied to the trust instrument.

(*Id.* at p. 421.) However, when the Supreme Court granted review, it implicitly rejected that theory.

Before reaching the merits of the case, the *Donkin* court addressed the preliminary question whether the trial court erred "as a procedural matter" by ruling on the safe harbor application after the operative date of the 2008 legislation. (*Donkin, supra,* 58 Cal.4th at p. 427.) To answer that question, the court applied section 3. It considered the general rule that " 'a new law applies on the operative date to all matters governed by the new law,' " and it also observed that under section 3, subdivision (d), even when a petition is filed before the operative date of a new law, " 'any subsequent proceedings taken after the operative date concerning the petition . . . is governed by the new law and not by the old law.' " (*Donkin,* at p. 427, italics omitted.) However, these rules did not answer the question before the court because a safe harbor application is a "matter" that is not governed by the new law and because the new law does not provide that an already pending safe harbor application would be subject to dismissal after the operative date of the new law. (*Ibid.*)

Ultimately, the *Donkin* court found its answer in section 3, subdivision (g) which, as discussed above, authorizes application of a repealed statute " '[i]f the new law does not apply to a matter that occurred before the operative date.' " (*Donkin, supra,* 58 Cal.4th at p. 427.) Since the *Donkin* beneficiaries filed their application *before* the operative date of the new legislation that repealed the safe harbor statute, the court found that "the cause was properly before the probate court" under section 3, subdivision (g). (*Donkin,* at p. 427.)

The *Donkin* court went on to conduct a separate inquiry to determine what substantive no contest law applied to the trust instrument in that case. (*Donkin, supra,* 58 Cal.4th at p. 428.) To answer that question, the court applied section 21315, which, as discussed above, limits the retroactive application of the current no contest law to instruments that became irrevocable on or after January 1, 2001. (*Donkin,* at p. 432.) Under that statute, the court found that the current law presumptively applied because the trust instrument became irrevocable after January 1, 2001. (*Ibid.*)

■ *Donkin* confirms our conclusion that the propriety of a safe harbor application is a procedural issue that must be resolved independently of the question regarding what substantive law governs the enforceability of the underlying no contest clause. Indeed, in *Donkin,* the trust beneficiaries were entitled to a safe harbor ruling under section 3, subdivision (g) notwithstanding the fact that the current no contest law applied to the trust instrument at issue in that case. In this case, unlike *Donkin,* Peter's safe harbor application

was not filed before the operative date of the new law. Thus, neither the section 3, subdivision (g) exception nor any other rule we have found authorized Peter to file his application under a statute that no longer exists.

Under these circumstances, the trial court erred by reaching the merits of Peter's safe harbor application. Instead, the application should have been dismissed or denied outright.

   C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V.

## DISPOSITION

In the December 2014 order, the finding that Peter's proposed petition constituted a contest of Trust I is reversed. The order denying Peter's safe harbor application is otherwise affirmed.

The May 2015 judgment is reversed and this matter is remanded to the probate court with directions to modify its findings in its March 13, 2014 order to the extent they conflict with our conclusions above, and to enter a new judgment denying Executors' petition for a determination that Peter violated the no contest clauses in Trust I and in Robert's will.

The parties are to bear their own costs on appeal.

Reardon, J., and Rivera, J., concurred.

---

*See footnote, *ante*, page 959.